UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/27/2021

UNITED STATES OF AMERICA,

-against-

KERMIT IRIZARRY,

Defendant.

1:21-cr-00060 (MKV)

**ORDER DENYING MOTION
TO DISMISS INDICTMENT**

MARY KAY VYSKOCIL, United States District Judge:

Defendant Kermit Irizarry is charged in a one-count Indictment with knowingly being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 2. *See* Indictment [ECF No. 5] ("Indictment"). Following his arraignment on the charge, Irizarry filed a motion to dismiss the Indictment on the ground that it was obtained in violation of the Sixth Amendment to the United States Constitution and the Judicial Selection and Service Act of 1968 ("JSSA"), 28 U.S.C. §§ 1861 *et seq.* Specifically, Mr. Irizarry argues that the grand jury that returned his indictment was not drawn from a fair cross section of the community due to selection and qualification issues with the manner of selection of jurors in this District. For the reasons that follow, Defendant's motion is DENIED.

## BACKGROUND

A.  *Method of Jury Selection in the Southern District of New York*

The United States District Court for the Southern District of New York hears cases arising out of the counties of New York, Bronx, Westchester, Rockland, Orange, Dutchess, Putnam, and Sullivan in New York State. 28 U.S.C. § 112(b). The Court conducts jury trials in Manhattan (in New York County) and in White Plains (in Westchester County). *Id.* In order to draw jurors for grand juries and trials in this District, the judges of the Court adopted a plan for the selection of jurors pursuant to authority delegated by the JSSA. *See* 28 U.S.C. § 1863(a).

1

The plan relevant to this case is the Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York, dated February 13, 2009 (the "SDNY Jury Plan"). *See* SDNY Jury Plan, attached as Exhibit A to Defendant's Memorandum in Support of Motion to Dismiss [ECF No. 11].

Pursuant to the SDNY Jury Plan, every four years, the Clerk of the Court assembles a "Master Jury Wheel" for each the Manhattan and White Plains courthouse. SDNY Jury Plan §§ III.A-III.C. The Master Wheel for each courthouse contains only names from the counties assigned to that courthouse. SDNY Jury Plan § III.C. Specifically, the Manhattan Master Wheel includes residents of New York, Bronx, Westchester, Putnam and Rockland counties, while the White Plains Master Wheel includes residents of Westchester, Putnam, Rockland, Orange, Sullivan and Dutchess counties. SDNY Jury Plan § III.C. Each county must be proportionally represented on the Master Wheels. SDNY Jury Plan §§ III.A.

As part of the process to assemble the Master Wheels, the Clerk first determines what numbers of jurors (for both grand and petit juries) is "sufficient to supply estimated Court juror needs for up to four years." SDNY Jury Plan § III.B. The Clerk then randomly draws that number of names from the list of registered voters in the counties assigned to each Master Wheel. SDNY Jury Plan §§ III.A, III.C.

As jurors are required for proceedings in the courthouses, but in any event no less than once or twice each year, the Clerk assembles a "Qualified Jury Wheel" for each of the courthouses. SDNY Jury Plan § III.D. To do so, the Clerk randomly selects jurors from the Master Wheel for each courthouse in a number "based upon anticipated juror demands for the ensuing six months plus a margin of extra names sufficient to compensate for the estimated number that will turn out to be unavailable or ineligible." SDNY Jury Plan § III.D. The Clerk

then mails a questionnaire to each person selected out of the Master Wheel to determine his or her eligibility and qualifications for sitting on a jury.[1] SDNY Jury Plan § III.D. Any person who returns the questionnaire as required, and who is determined to be eligible and qualified to sit on a jury based on his or her responses, is placed on the "Qualified Jury Wheel" from which names are drawn and potential jurors are summoned for specific proceedings. SDNY Jury Plan §§ III.D, IV.A.

B.  *Procedural History*

Defendant Kermit Irizarry was arrested in January 2021 after the filing of a criminal complaint. *See* Complaint [ECF No. 1]. He was presented in this District, *see* Minute Entry dated January 19, 2021 [ECF No. 4], and thereafter was indicted by a grand jury sitting in Manhattan. *See* Indictment [ECF No. 5].

Following Mr. Irizarry's arraignment on the Indictment, *see* Minute Entry dated February 2, 2021, he filed a motion to dismiss the Indictment based on alleged defects in the composition of the Manhattan Master and Qualified Jury Wheels from which the grand jury that indicted him was drawn. *See* Motion to Dismiss the Indictment [ECF No. 10]. In particular, Mr. Irizarry argues that his Sixth Amendment rights were violated because "Black and Latino individuals" were "systematically underrepresented" in the District's jury wheels and, as a result, the grand jury that indicted him was not drawn from a fair cross section of the community. *See* Def. Br. at

---

[1] Consistent with the relevant federal law, the SDNY Jury Plan provides that all persons are eligible for jury service unless they (1) are not a citizen of the United States at least eighteen years old who has resided for a period of one year within the judicial district, (2) are unable to read, write, and understand English with a degree of proficiency sufficient to fill out the juror qualification questionnaire, (3) are unable to speak English, (4) are incapable, by mental or physical infirmity, to render satisfactory jury service, or (5) have a charge pending for the commission of, or has been convicted in a State or Federal court, of a felony and his or her civil rights have not been restored. SDNY Jury Plan Art. VII, *see also* 28 U.S.C. § 1865(b). In addition, certain categories of people are exempt or excused from jury service by reason of their employment or position in government or because service could entail undue hardship. SDNY Jury Plan Art. V-VI. The questionnaire mailed by the Clerk to potential qualified jurors seeks to identify individuals who are exempt, excused, or unqualified pursuant to these rules.

1-2, 4.[2]  Mr. Irizarry also alleges a violation of the JSSA in connection with the creation of the jury wheels for the District.  *See* Def. Br. at 12-16.  For support, Defendant submits a declaration from Jeffrey Martin, a consultant on statistical and actuarial issues who previously has served as an expert witness in federal litigation and who has experience in cases involving challenges to jury lists.  *See* Declaration of Jeffrey Martin ("Martin Decl.") ¶¶ 1-3 (filed as Def. Br. Ex. C).  Relying on Mr. Martin's analysis, Defendant posits seven potential causes for the disparity he identifies:

1) The use of voter registration lists as the sole source of names for the Master Wheel (Martin Decl. ¶ 78) ;
2) The omission of "inactive" voters from the voter registration lists used to create the Master Wheel (Def. Br. at 15-16; Martin Decl. ¶¶ 53-58);
3) The exclusion of some 18-21-year-old persons from the list because the Master Wheel is updated every four years (Martin Decl. ¶¶ 70-73);
4) The staleness of addresses for individuals in the Master Wheel because the information is only updated every four years (Martin Decl. ¶ 74);
5) An acknowledged error in transferring alternative mailing addresses for certain voters who reside in Putnam County (Def. Br. at 16, Martin Decl. ¶¶ 65-66, 74);
6) That questionnaires returned as undeliverable resulted in a person's exclusion from the Qualified Wheel (Martin Decl. ¶ 84); and
7) That questionnaires that were never responded-to or returned resulted in a person's exclusion from the Qualified Wheel (Martin Decl. ¶ 85).

The Government opposes Mr. Irizarry's motion.  *See* Memorandum of Law in Opposition to Motion to Dismiss [ECF No. 15] ("Opp.").  Along with its opposition, the Government offers a report from Dr. Bernard Siskin, a statistics consultant with experience working for governmental organizations on issues related to racial disparities.  *See* Report of Bernard Siskin, Ph.D. ¶ 1 (filed as Opp. Ex. A).  Dr. Siskin disputes several of Mr. Martin's conclusions and quantifies the effects of the issues identified by Mr. Martin and detailed in Defendant's motion

---

[2] As used herein, "Def. Br." refers to Defendant's Memorandum of Law in Support of the Motion to Dismiss the Indictment, filed at ECF No. 11.

papers. *See* Opp. at 1.  After careful consideration of all of the filings in connection with Defendant's motion,[3] the motion to dismiss the Indictment is denied.

## ANALYSIS

### A.   *Defendant's Sixth Amendment Challenge*

"The Sixth Amendment guarantees a criminal defendant a jury selected from a fair cross section of the community." *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996).  In order to establish a *prima facie* violation of the fair cross section requirement, a defendant must satisfy the three-part test set out by the Supreme Court in *Duren v. Missouri*, 439 U.S. 357 (1979). Specifically, a movant has the burden to show that (1) the excluded group is "distinctive"; (2) representation of this group in "venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;" and (3) the under-representation is due to "systematic exclusion of the group in the jury-selection process." *Id.* at 364.  If a defendant is able to make such a *prima facie* showing, the burden shifts to the Government to show that "attainment of a fair cross section [would] be incompatible with a significant state interest." *Id.* at 368-69.  To succeed on a Sixth Amendment claim, it is not necessary to show discriminatory intent. *United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990).

### 1.   **Duren *Factor One: Distinctive Group***

Both parties agree that Defendant's Sixth Amendment claim, which alleges under-representation of Black and Latino people in the jury wheels for the District, satisfies the first

---

[3] The Martin Declaration was initially submitted in connection with Defendant's opening brief.  *See* ECF No. 11, Ex. C.  However, Defendant attached a "slightly more expansive" declaration to his reply brief.  *See* Reply Memorandum of Law [ECF No. 20] ("Reply") at 5 n.1, Ex. A. The Government did not have an opportunity to respond to the new evidence in the reply declaration.  Moreover, the new details added in the revised declaration pertain largely to a jury venire drawn out of the Qualified Wheel for a trial in a different case in this District and not to this case.  As a result, while the Court has considered the information contained in the revised declaration, the citations to the Martin Declaration herein are to the original Declaration submitted with Defendant's opening brief.

*Duren* factor, since these are recognized "distinctive" groups. *See* Def. Br. at 5 (citing *United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995)); Opp. at 5.

### 2. Duren *Factor Two: Significant Under-representation*

The second *Duren* factor requires the Court to consider whether the jury wheel has a significant under-representation of the distinctive groups—here, Black and Latinos—as compared to the proportion of those groups in the community population. *Duren*, 439 U.S. at 364. However, to perform that analysis, the Court must first determine which jury wheel is relevant to Defendant's arguments and what the percentages of the relevant community population are Black or Latino for the purpose of comparing the percentages to those in the jury wheels.

### a. *The Court Must Consider Both Manhattan Jury Wheels*

The parties dispute which jury wheel should be used to analyze Defendant's fair cross section claim. Defendant submits that the Qualified Wheel must be considered in connection with each of the alleged causes of under-representation. *See* Reply at 2-6.[4] The Government urges a more fact-specific approach in which the Court considers the jury wheel most relevant or directly connected to each of Defendant's alleged defects or deficiencies related to the under-representation. *See* Opp. at 7-10. For the reasons stated below, the Court agrees with the Government's approach.

"Neither the Supreme Court nor the Second Circuit has defined the 'relevant jury pool' [for the purposes of the second *Duren* factor] with any specificity." *United States v. Rioux*, 930 F. Supp. 1558, 1565 (D. Conn. 1995). However, following a thorough analysis in *Rioux*, that

---

[4] As used herein, "Reply" refers to the Reply Memorandum of Law in Further Support of the Motion to Dismiss the Indictment [ECF No. 20].

6

court, and others since, have most often considered the jury pool "in the context of the systematic defect identified by the defendant." *Id.* at 1566-58; *United States v. Scott*, __ F. Supp. 3d __, 2021 WL 2643819, at *5 (S.D.N.Y. 2021); *United States v. Schulte*, No. S3 17 CR. 548 (PAC), 2021 WL 1146094, at *4 (S.D.N.Y. Mar. 24, 2021); *United States v. Allen*, 2021 WL 431458, at *5 (S.D.N.Y. Feb. 8, 2021). As another judge in this District recently has phrased it, the relevant jury pool is the one that "bears the brunt of the defendant's allegations of systematic exclusion." *Schulte*, 2021 WL 1146094, at *4. Under this approach, the Court determines which of the Master Wheel and the Qualified Wheel is appropriate for the analysis based on the specific challenges the defendant raises to the jury selection process. *Scott*, 2021 WL 2643819, at *5.

Here, the Court must review both the Master and Qualified Wheels because Defendant's charged causes of alleged under-representation differ as to which wheel each purportedly affects. For example, the omission of "inactive" voters from the lists used to create the Master Wheel, *see* Def. Br. at 15-16; Martin Decl. ¶¶ 53-58, obviously affects primarily the Master Wheel. On the other hand, the elimination of those already in the Master Wheel from the Qualified Wheel if they do not return a questionnaire or if a questionnaire is returned as undeliverable, *see* Martin Decl. ¶¶ 84-85, affect only the construction of the Qualified Wheel. As a result, the Court must compare the community population to each of the Master and Qualified Wheels to determine if there is a significant under-representation of Black and Latino people.

### b. Relevant Community for Comparison

The parties appear to agree that the relevant community against which the Court must compare the jury wheels is the population of people, age eighteen and older, in the counties from which the Manhattan Master and Qualified Wheels are drawn. *See* Opp. at 6; Martin Decl. ¶¶ 13, 23. Defendant's expert quantifies that community as containing a population that is 54.94%

White, 28.44% Hispanic or Latino, 21.19% Black or African American, 0.46% American Indian or Alaska Native, 6.45% Asian, 0.07% Native Hawaiian or Pacific Islander, 13.75% of some other race, and 3.14% multi-racial.  Martin Decl. ¶ 23.  Relying on slightly different population measurements,[5] the Government's expert actually determines that the population is more diverse, a position more favorable to Defendant, and states that the same population is 21.80% Black and 29.29% Latino.  Siskin ¶¶ 8, 21.  In reply, Defendant uses both his own expert's numbers and those offered by the Government.  *See* Reply at 6.  In light of that, the Court will use the numbers most advantageous to Defendant here, which are those offered by the Government.

          ***c.***      ***There Is Not Significant Under-representation in Either Jury Wheel***

Having determined the relevant jury wheel and the relevant community population, the Court turns to the under-representation analysis.  The "primary approach in this Circuit" for determining whether a population is under-represented in a jury venire is the so-called "absolute disparity" method.  *See Rioux*, 97 F.3d at 655-56, *Allen*, 2021 WL 431458, at *8 (collecting cases and applying the method).  The Court will not vary from that method here.

"The absolute disparity method measures the difference between the groups' representation in the relevant community and their representation in the jury venire.  For example, if African Americans compose 10% of the community but only 5% of the jury venire, the absolute disparity is 5%."  *Schulte*, 2021 WL 1146094, at *7.  Second Circuit precedent holds that absolute disparities of nearly 5% ***do not satisfy*** the second *Duren* factor or establish under-representation.  *See United States v. Ramnath*, 131 F.3d 132 (2d Cir. 1997) (absolute disparities

---

[5] Both Mr. Martin and Dr. Siskin rely on the "American Community Survey" for their population estimates.  This survey gathers demographic information from Americans in between the official census counts.  Martin Decl. ¶ 14; Siskin Rep. ¶ 19.  The latest available data from the survey is for the year 2019.  Siskin Rep. ¶ 19.  However, the data is published as both a five-year average, which Mr. Martin uses here, and as a one year report, which Dr. Siskin uses.  Martin Decl. ¶ 14; Siskin Rep. ¶ 19.

8

of 3.45% and 4.87% were insufficient to satisfy the second *Duren* factor) (unpublished disposition); *Biaggi*, 909 F.2d 662, 677-78 (2d Cir. 1990) (absolute disparities of 3.6% and 4.7% were insufficient to satisfy the second *Duren* factor); *see also Scott*, 2021 WL 2643819, at *10 (3.69% and 3.64% were insufficient); *Schulte*, 2021 WL 1146094, at *7 (same and collecting cases). Because the Second Circuit never has established a bright line with regard to what percentage disparity would constitute under-representation, the Government points the Court to precedent from other Circuits which hold that the second *Duren* factor is not satisfied even if the absolute disparity reaches 10%. *See Ramseur v. Beyer*, 983 F.2d 1215, 1232 (3d Cir. 1992) (14.1% absolute disparity was "borderline significan[t]," but ultimately rejecting the claim); *see also United States v. Phillips*, 239 F.3d 829, 842 (7th Cir. 2001) ("[A] discrepancy of less than ten percent alone is not enough to demonstrate unfair or unreasonable representation of blacks on the venire."); *United States v. Grisham*, 63 F.3d 1074, 1078–79 (11th Cir. 1995) ("If the absolute disparity . . . is 10 percent or less, the second element is not satisfied."); *United States ex rel. Barksdale v. Blackburn*, 639 F.2d 1115, 1126 & n.26 (5th Cir. 1981) (11.5% absolute disparity does not state *prima facie* case).

One additional Second Circuit case deserves specific mention, however. In *United States v. Jackman*, the Second Circuit found that a Defendant did satisfy the second *Duren* factor by identifying disparities of 2.5% for Blacks and 3.4% for Latinos. 46 F.3d 1240, 1247-48 (2d Cir. 1995). Recognizing that this result directly conflicted with the decision in *Biaggi*, the Court emphasized that these disparities were problematic only because the circumstances leading to them were "far less benign" than those in *Biaggi*. *Id.* at 1247. Specifically, the *Jackman* jury process involved the clerk of the Connecticut court affirmatively choosing to draw a jury venire from a wheel that had previously been adjudicated to wrongfully exclude the vast majority of the

9

eligible Black and Latino population. *Id.* at 1243-44. Based on the previous adjudication and the seemingly contumacious conduct involved in continuing a program found to be unlawful, the Circuit held that these lower disparities violated the defendant's rights. *Id.* at 1247. Even with these details, the *Jackman* decision drew a dissent that argued that the conclusion was "at odds with every decision in every circuit applying the *Duren* test" and collected cases holding only far larger disparities as actionable. *Id.* at 1252 (Walker, J., dissenting). Defendant points to no case, and the court is unaware of any, that holds *Jackman* to have imposed a general rule for cases involving distinguishable fact patterns. As a result, the Court reads *Jackman* narrowly and instead relies on the other precedents previously discussed. In addition, as further explained below, the benign causes that Defendant offers for any disparities here make the *Jackman* rationale inapplicable in this case.

In this case, when examining the Master Wheel, there is an absolute disparity of 1.34% for Blacks and 0.04% for Latinos in the Master Wheel as compared to the general population. Surely, these disparities do not rise to a level sufficient to raise constitutional concerns.

The percentages differ when compared to the Qualified Wheel, there is absolute disparity of 5.72% for Blacks and 9.88% for Latinos. As noted above, the Second Circuit has held that disparities near 5% are not sufficient to satisfy the second *Duren* factor. Thus, only the last figure, a 9.88% disparity between the Latino population in the community and the Latino proportion of the Qualified Wheel, to raise any concern, since it is above the disparities evaluated by the Second Circuit. However, this disparity is still well within the range approved by other Circuits. *See, e.g.*, *Phillips*, 239 F.3d at 842. Lacking a specific answer from the Second Circuit, the Court adopts the reasoning of these cases and finds that none of the

disparities alleged here satisfy the second *Duren* factor. As a result, Defendant has not established a significant under-representation in either the Master or the Qualified Wheel.[6]

### 3. Duren *Factor Three: Systematic Exclusion*

Even if Defendant were able to show that there was significant under-representation in either of the jury wheels, his motion nonetheless fails because none of the proposed causes he identifies results in "systematic exclusion of the group [*i.e.* Blacks or Latinos] in the jury-selection process." *Duren*, 439 U.S. at 364. Just as Judge Crotty recently ruled in connection with nearly identical arguments made by another defendant who was relying on the same expert declaration as offered here, *see Tagliaferro*, 2021 WL 1172502, Defendant has failed to satisfy the third *Duren* factor. The causes of under-representation Defendant identifies are benign and far outside the Court's control, making them non-actionable under the Sixth Amendment.

In order to show a systematic exclusion, Defendant must identify a cause of the under-representation that is "due to the system of jury selection itself, rather than external forces." *Rioux*, 97 F.3d at 658. Put another way, "systematic exclusion does not occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group." *United States v. Barlow*, 732 F. Supp. 2d 1, 40 (E.D.N.Y. 2010), *aff'd* 479 F. App'x 372, 373 (2d Cir. 2012). The Second Circuit has stated that it is "unclear whether statistics alone can prove systematic exclusion. Even if they can, however, they would have to be of an overwhelmingly convincing nature." *Rioux*, 97 F.3d at 658 (citing *United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994)).

---

[6] While noting that he "d[id] not need to reach the second *Duren* factor" because the defendant ultimately failed on the third factor, Judge Crotty of this Court recently found that arguments substantially similar to—if not identical to—Defendant's arguments here also would fail to establish significant under-representation. *See United States v. Tagliaferro*, 2021 WL 1172502, at *4 n.1 (S.D.N.Y. Mar. 29, 2021). This conclusion also supports the Court's conclusion here.

Defendant's first argument, and essentially his only argument in his opening brief, is that he satisfies the third *Duren* factor simply because the disparities he identifies have existed for several years and have not decreased over that time. *See* Def. Br. at 9-11. This argument cannot succeed as it "conflates *Duren*'s under-representation element with the systematic exclusion inquiry" and ignores Defendant's burden to "isolate specific flaws in the [SDNY] Jury Plan and then prove that those flaws are what caused the under-representation at issue." *Tagliaferro*, 2021 WL 1172502, at *3 (citing *Rioux*, 97 F.3d at 658). Moreover, as noted above, this argument fails because it solely relies on statistics that are not "of an overwhelmingly convincing nature." *Rioux*, 97 F.3d at 658; *Anderson v. Casscles*, 531 F.2d 682, 685 (2d Cir. 1976) ("The law is clear that evidence of mathematical disparity, without more, is insufficient to make out a prima facie case of improper jury selection.").

In his reply, Defendant makes additional arguments about the causes of the disparities identified above ("inactive" voter exclusions, failure to update the Master Wheel more frequently than once every four years, exclusions of voters whose questionnaires were returned as undeliverable, etc.), none of which are persuasive. *See* Reply at 8-11. Certain of Defendant's supposed causes of under-representation are foreclosed by precedent. For example, the Second Circuit has noted that "absent positive evidence that some groups have been hindered in attempting to register to vote, a jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal protection." *Schanbarger v. Macy*, 77 F.3d 1424 (2d Cir. 1996) (per curiam) (citations omitted). This rule forecloses Defendant's arguments both about the use of voter lists generally and about "inactive" voter exclusion, *see* Martin Decl. ¶¶ 53-58, 78, because the lists constitute the normal voter lists for the relevant counties, because the lists excluding "inactive" voters were

12

created by third-parties, not the Court, and because Defendant has not presented any affirmative evidence of racially discriminatory voter registrations. *See* Opp. at 19.

Several of the other causes Defendant posits also are clearly foreclosed because they are solely external forces outside the Court's control. For example, the exclusion of potential jurors who fail to return questionnaires, or the exclusion of potential jurors whose questionnaires are returned as undeliverable, are both dependent on outside forces—the potential juror's failure to return the questionnaire or the realities of demographic change and movement of people over time. *Cf. Rioux*, 97 F.3d at 658 ("The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes."). Similarly, Defendant argues that under-representation is caused by the District's failure to update the jury wheels more frequently than once every four years, as Black and Latino people "disproportionately move more frequently than the rest of the population." Martin Decl. ¶ 14. This too is foreclosed by the clear rule that "demographic change" is an external force that cannot support a charge of a systemic exclusion in violation of the Sixth Amendment. *Id.*; *Tagliaferro*, 2021 WL 1172502 at *4.

Only one of Defendant's proposed causes merits individual discussion. Defendant submits that under-representation is caused by an error in the District's computer coding system for potential jurors that resulted in the exclusion from eligibility for any voter who provided an alternative mailing address in Putnam County which differs from his or her voter registration address. *See* Def. Br. at 16, Martin Decl. ¶¶ 65-74. It appears undisputed that this error occurred. *See* Martin Decl. ¶ 65. If the error caused substantial systemic exclusions of Black or Latino voters from jury service, it is conceivable that it could satisfy the third *Duren* factor. However, Defendant admits that only 3,333 people were excluded from the wheel as a result of

this error.  *See* Def. Br. at 16.  Defendant provides no estimation about the percentage of these people who are Black or Latino or how much this error resulted in under-representation.  The Government's expert does quantify the extent to which this error results in under-representation—and concluded that this error results in a negligible ***increase*** in Black and Latino representation in the Master Wheel (an approximately 0.005% increase in the absolute proportion of the people in the wheel who are Black or Latino).  *See* Opp. at 20, Siskin Rep. ¶¶ 9, 38.  The Defendant does not contest this conclusion in his reply.  Based on the Government's expert evidence, which Defendant does not oppose, the Court concludes that the admitted error related to Putnam County residents is a minor technical issue that excluded 3,333 people from the Master Wheel, and that this issue was otherwise facially neutral, does not demonstrate systematic exclusion, and, in fact, may have actually increased Black and Latino representation in the Master Wheel (albeit by a negligible amount).  *See* Opp. at 20 (citing *United States v. Savage*, 970 F.3d 217, 259 (3d Cir. 2020)).

In short, nearly all of the potential causes of under-representation that Defendant identifies are external factors outside the Court's control which cannot give rise to a Sixth Amendment fair cross section claim.  The one cause that Defendant points to that is within the Court's control may actually have increased Black and Latino representation in the jury wheels.  And even if it did not, Defendant has not provided the Court any information on which to find that the identified error excluded Black and Latino jurors at all.  Defendant has wholly failed to satisfy the third *Duren* factor.  As such, Defendant cannot make a *prima facie* case for a under-representation in the District's jury wheels and his motion, to the extent it is based on the Sixth Amendment fair cross section claim, is denied.

B.    *Defendant's JSSA Claim*

To establish a JSSA violation based on under-representation in a jury pool, just as with a Sixth Amendment claim, a defendant must satisfy the *Duren* test. *United States v. Rioux*, 97 F.3d 648, 654, 660 (2d Cir. 1996). But, a defendant raising a JSSA challenge must base his or her claim on a "substantial failure to comply" with one of the provisions of the JSSA. 28 U.S.C. § 1867(a). "Mere technical violations" of the JSSA do not met this burden. *United States v. LaChance*, 788 F.2d 856, 870 (2d Cir. 1986). Among other things, the JSSA forbids the exclusion of jurors based on their race or national origin, authorizes the use of voter registration lists to create jury wheels, and requires that "each county . . . within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division" 28 U.S.C.§§ 1862, 1863(b)(2)-(3).

Because the Court concludes that Defendant wholly failed to satisfy the *Duren* test in connection with his Sixth Amendment claim, the JSSA claim fails for the same reasons.

Moreover, the thrust of Defendant's JSSA claim also fails on its merits because he identifies no "substantial violation" of the JSSA. The primary alleged violation to which he points is the exclusion of "inactive" voters from the registration lists used to construct the Master Wheel. The Court agrees with the analyses performed by Judges Crotty and Román of this District finding that this is not a violation of the JSSA, and, even if it were, any such violation is merely a "technical" one. *See Tagliaferro*, 2021 WL 1172502, at *5, *Allen*, 2021 WL 431458, at *10. As a result, the JSSA claim fails.

## CONCLUSION

For the reasons stated herein, Defendant has failed to make a *prima facie* case for violation of the Sixth Amendment fair cross section requirement. He also has failed to establish

15

a violation of the Judicial Selection and Service Act.  Accordingly, the Motion to Dismiss the

Indictment in this case is DENIED.

The Clerk of Court respectfully is requested to close the motion at ECF No. 10.

**SO ORDERED.**

Date:   August 27, 2021
        New York, New York

        MARY KAY VYSKOCIL
        **United States District Judge**